# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JILL GREWCOCK,<br>    *Plaintiff*,<br><br>v.<br><br>YALE NEW HAVEN HEALTH SERVICES CORPORATION,<br>    *Defendant*. | No. 3:16-cv-00452 (JAM) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Jill Grewcock worked as a "clinical bed manager" for defendant Yale-New Haven Health Services Corporation. Plaintiff was also a nursing mother, and she needed to express or pump breast milk for her child during working hours. She was fired from her job after several months of conflict with her supervisors about whether she must use a designated lactation room to engage in pumping activity.

Plaintiff has filed this action alleging that she was the victim of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the cognate provisions of the Connecticut Fair Employment Practices Act. Defendant has now moved for summary judgment, contending in large part that plaintiff was fired for reasons having nothing to do with her nursing mother activities but because she improperly accessed the medical records of a relative of one of plaintiff's co-workers.

I conclude that a nursing mother's ability to engage in nursing-related activity like expressing breast milk is subject to protection from discrimination under both Title VII and CFEPA. I further conclude that genuine fact issues remain to support plaintiff's discrimination and related retaliation claims. Accordingly, I will largely deny defendant's motion for summary judgment.

1

## BACKGROUND

The following facts are either not disputed or, where disputed, are presented in the light most favorable to plaintiff as the non-moving party.[1] Plaintiff started working for defendant in February 2011 as a Clinical Bed Manager. Doc. #17-4 at 1; Doc. #1 at 2 (¶ 7). According to the position description, a Clinical Bed Manager "is responsible for oversight of all patient admission, discharges and transfer activity" as well as "facilitating continuous throughput of patients from all points of entry . . . ." Doc. #22-7 at 2. During her time in the position, plaintiff generally received positive evaluations. Doc. #22-6 at 13-50.

Plaintiff gave birth to a child in October 2013. Doc. #22-4 at 3. Two months later she returned to work from maternity leave. Doc. #17-2 at 6. After she returned to work, plaintiff expressed breast milk during the day when she was away from her child, and she used the office she shared with a colleague to do so. *Id.* at 7. Plaintiff discussed the matter with her direct supervisor, Piper Brien, who stated that she had no problem with plaintiff expressing milk; on occasion, Brien permitted plaintiff to express milk in her own office when plaintiff's office was occupied. *Id.* at 8. Over the course of the following year, plaintiff carried out her duties as normal and expressed milk at work without incident. *Ibid.*

Nearly a year after plaintiff's return to work, defendant decided to require that plaintiff use a designated lactation room for her expressing activity. On December 1, 2014, Beth Ciotti, who had taken over from Brien as plaintiff's supervisor, forwarded to department employees an e-mail from Peggy Beley, the director of Patient Finance and Admitting Services, indicating that

---

[1] Defendant's reply brief criticizes alleged inconsistencies between plaintiff's affidavit and her deposition testimony, and defendant argues that the affidavit should not be relied on to create a genuine issue of fact sufficient to withstand summary judgment. Doc. #28 at 3. Because I need not rely on evidence in plaintiff's affidavit, as opposed to her deposition and other evidence, to find a genuine issue of material fact, I decline to address these inconsistencies.

all nursing mothers should use the hospital's private lactation rooms. Doc. #17-4 at 2; Doc. #22-7 at 28. The e-mail explained that "[t]his is not an option, as it makes surrounding staff uncomfortable." *Ibid.* Plaintiff was the only nursing mother in her department at that time. Doc. #17-2 at 12-13.

Plaintiff approached Ciotti to state her concern about the email. *Id.* at 13. Ciotti explained that someone had complained and that she really could not argue with it from a corporate standpoint. *Ibid.* Plaintiff asked Ciotti if she could use Ciotti's office if needed, but Ciotti said that she was not obligated to do that. *Ibid.*

Later that day, plaintiff raised the matter with Brien, who told plaintiff not to worry about it and that she would arrange for a clerical worker to cover plaintiff's calls while she was away from her desk in a lactation room. *Id.* at 13-14. Plaintiff replied that clerical staff lacked the ability to cover her duties, and this would compromise patient safety if she were away from her office. *Id.* at 14.

Plaintiff started using the hospital's lactation rooms at times but she had difficulty finding rooms that were not already occupied, and her absences took a toll on plaintiff's workflow. Doc. #17-2 at 8, 9. Certain staff members refused to leave messages with the clerical staff. Doc. #22-7 at 26. Others would call and refuse to identify themselves. *Ibid.* On another occasion, plaintiff was unable to fully address a situation involving the arrival of a Life Star Helicopter. Doc. #17-2 at 9.

Unhappy with the situation, plaintiff wrote an e-mail on December 5 to David Wurcel, who was Vice-President of Corporate Business and Beley's supervisor. Doc. #17-2 at 33. In the e-mail plaintiff stated that she wished to formally invoke the grievance process "due to my department's refusal to allow me to express breast milk in the privacy of the clinical bed

3

manager's officer, or an adjacent vacant office," and she alleged that "my department is willing to compromise patient safety by allowing clerical workers to take messages of an emergent nature in my absence." *Ibid.* Plaintiff was then contacted by Patricia Burke, Executive Director of Human Resources, on Wurcel's behalf, who told her that her complaint did not fall within the scope of matters that could be grieved. Doc. #17-4 at 3.

Plaintiff followed up with Wurcel on December 8 with an "addendum" email to stress her dissatisfaction with the policy, to request to meet with him, and to state her concern about Burke's "bias" in the handling of the issue, because Burke had told plaintiff that she had been "'accommodated with breast feeding long enough and it's time to return to business as usual.'" Doc. #17-2 at 31-32. Wurcel then responded on December 9 that he "would be happy to meet with you," but that he did not think the meeting was necessary, that "the organization has facilities available to meet your needs," and that "I would very much like you not [to] be angry about this decision but understand that we need to consider others needs on your team as well." *Id.* at 31. Plaintiff responded that she would "continue to use the [lactation rooms in the] West Pavill[i]on as desired." *Id.* at 31.

In the meantime, plaintiff did not always use a lactation room, and this upset her supervisors. On December 2, plaintiff was expressing milk in the office that she shared with her co-worker Linda Konet, who was supportive of plaintiff's position regarding the lactation policy. Doc. #17-2 at 9, 18; Doc. #22-4 at 4. Brien entered the office and "yelled" at plaintiff "in a loud angry tone." Konet and Brien proceeded to engage in a shouting match, and Brien slammed the door. Doc. #17-2 at 18; Doc. #22-4 at 4.

Plaintiff continued to feel harassed by Ciotti and Brien. According to plaintiff, Ciotti and Brien frequently entered plaintiff's office without knocking. Doc. #17-2 at 17. When plaintiff

4

had meetings with a co-worker in her office, Brien and Ciotti entered the office and said "You better not be pumping in here." *Ibid.* If plaintiff had her breast pump within view, she was questioned about its presence, even if she had not been expressing milk in the office. *Ibid.* For her part, Beley became "hostile" toward plaintiff after she had filed the grievance with Wurcel. Doc. #17-2 at 23.

A meeting was held on December 23, 2014, to address issues plaintiff was facing. Doc. #17-4 at 5; Doc. #17-2 at 34. At that meeting, Beley reiterated the policy that staff members who choose to express milk must utilize one of the lactation rooms. Doc. #17-2 at 34. Around the same time, plaintiff was told by Burke that she was not facing a disciplinary "write-up" for recently expressing milk in her office. *Id.* at 18, 34.

About one month later, on January 23, 2015, plaintiff had a particularly urgent need to express milk and she resorted to using the bathroom. *Id.* at 16. On that occasion, Brien entered the bathroom, peered through the cracks of the stall, asked plaintiff if she was expressing milk inside the bathroom stall, reiterated that she was not allowed to do so, and ordered her out of the stall. *Ibid.* When plaintiff did not immediately emerge from the bathroom, Beley, who was waiting outside, shouted plaintiff's name to summon her outside. *Ibid.*

When plaintiff emerged from the bathroom, Beley took plaintiff to her office to discuss plaintiff's use of the bathroom for the purpose of expressing milk. *Ibid.* Plaintiff explained to Beley why she had to use the bathroom, and she noted that other departments routinely permit nurses to express milk in offices and break rooms. *Ibid.* Beley was unmoved, stating that she did not care about plaintiff's explanation or the fact that other departments in the hospital had a more lenient policy. *Ibid.*

In February, plaintiff e-mailed Burke again to seek a more convenient accommodation for herself and to address her concerns about the incident with Brien and Beley in the bathroom. *Id.* at 19-20. This was followed by a meeting on March 3, 2015, with Beley, Burke, Ciotti, and plaintiff to address plaintiff's concerns about where she was permitted to express milk. Doc. #17-4 at 5; Doc. #17-2 at 20. It was agreed at the meeting that plaintiff could use the bathroom. Doc. #17-2 at 20.

The next incident of consequence concerned plaintiff's briefly accessing the medical record of a relative of one of plaintiff's supervisors. On March 24, 2015, a relative of a supervisory staff member of the hospital was evaluated as a patient in the emergency department. Doc. #17-2 at 23. Plaintiff electronically accessed the chart of the patient and viewed various screens for a total of less than 20 seconds. *Id.* at 40. According to plaintiff, the purpose of her review of this particular patient's chart was to ascertain the patient's bed needs, *i.e.*, where the patient may need to be transferred. Doc. #17-2 at 23. This patient's chart was one of a number of charts plaintiff reviewed that evening. *Ibid.* Although the department to which this patient was to be transferred had its own bed managers, clinical bed managers in plaintiff's department routinely reviewed such records. *Id.* at 25. According to plaintiff, she did not surmise that the patient was related to a hospital staff member until she had accessed the file. *Ibid*.

The next day, March 25, Beley requested an audit of who had accessed that particular patient's chart. Doc. #22-7 at 41. The audit revealed that fifteen unique users of the system accessed the patient's chart, including plaintiff. *Id.* at 44, 46. On March 31, 2017, Beley inquired with Terrie Estes, the hospital's compliance and privacy officer, what to do in view of her belief that two staff members accessed the patient's chart without "any business purpose." *Id.* at 45. Beley also e-mailed Burke with a view toward discussing the matter further with her. *Ibid.*

6

While Beley was conducting her inquiry into plaintiff's review of the patient's chart, plaintiff continued to pursue the matter of accommodating her need to express milk. Around March 26, plaintiff inquired with Burke about a meeting that Beley had with another staff member in the hospital, apparently to follow up on the meeting held on March 3. Doc. #17-2 at 21, 38. Burke informed plaintiff that Beley and another staff member, identified as Melissa, wanted to show plaintiff a room in which she could express milk during the "off shifts." *Id.* at 38.

On or about March 31, plaintiff met with Beley and Melissa to discuss the accommodation that Beley had arranged; Beley said she did not have an accommodation in mind but said that she and the staff supported plaintiff. *Id.* at 21, 38. Plaintiff explained to Beley that she did not feel supported and was concerned about disciplinary action for expressing milk in the bathroom should she become pregnant again in the future. *Id.* at 21. Melissa was shocked at the suggestion of discipline for expressing milk in the bathroom, and Beley avoided the subject. *Id.* at 38. On April 1, plaintiff mentioned to human resources the topic of becoming pregnant again. *Id.* at 57.

In the meantime, another meeting was held to discuss plaintiff's review of the patient chart on March 24. Doc. #17-4 at 7. Plaintiff explained that it was part of her normal responsibilities to access the patient's record. *Ibid.* But her superiors did not agree. On April 10, plaintiff was informed that Beley and Wurcel had decided to terminate her for violation of the hospital's privacy policy and the Health Insurance Portability and Accountability Act (HIPAA). Doc. #22-7 at 53.

Around the same time, the other staff member who had allegedly improperly accessed the patient's chart, a male paramedic, was also fired. Doc. #17-3 at 2. Plaintiff filed a grievance

regarding her discharge. Doc. #22-7 at 55. After reviewing all of the evidence, Wurcel upheld plaintiff's termination, concluding that she lacked a "bonafide business need" to access the patient's chart as it was outside the scope of her employment. Doc. #17-2 at 24-25, 40.

Plaintiff's court complaint contains three remaining counts of discrimination on the basis of plaintiff's pregnancy, gender, and familial status. Count One alleges a violation of Connecticut's general anti-discrimination law, Conn. Gen. Stat. § 46a-58. Count Two alleges a violation of the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60. Count Three alleges a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[2]

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Count One – Discrimination under Conn. Gen. Stat. § 46a-58*

---

[2] Plaintiff also alleged in Count Four of the complaint a violation of 42 U.S.C. § 1981. I dismissed that claim after plaintiff declined to file an opposition to defendant's motion to dismiss. *See* Doc. #15.

8

Count One of the complaint alleges discrimination in violation of Conn. Gen. Stat. § 46a-58, a statute that broadly prohibits acts of discrimination.[3] The Connecticut Supreme Court has held, however, that § 46a-58(a) does not apply to discriminatory employment practices that are otherwise specifically covered by the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60. *See Comm'n on Human Rights & Opportunities v. Truelove & Maclean, Inc.*, 238 Conn. 337, 346 (1996). Because the complaint alleges discrimination in the context of an employment relationship and a separate violation of § 46a-60 (as discussed below), I will grant defendant's motion for summary judgment as to Count One.

*Counts Two and Three – Employment Discrimination*

Plaintiff claims that defendant discriminated against plaintiff in violation of Title VII and CFEPA on grounds of her pregnancy, gender, and familial status.[4] Both Title VII and CFEPA prohibit employers from discriminating against employees on grounds of their sex or pregnancy. *See* 42 U.S.C. § 2000e-2(a)(1) & § 2000e(k); Conn. Gen. Stat. § 46a-60(b)(1) & (b)(7); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546, 556 (2d Cir. 2010). Claims arising under both Title VII and CFEPA are analyzed under the familiar *McDonnell-Douglas* three-part burden shifting standard. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *Craine v. Trinity Coll.*, 259 Conn. 625, 637 (2002).

First, a plaintiff must show facts to establish a *prima facie* case: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an

---

[3] Conn. Gen. Stat. § 46a-58(a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability or status as a veteran."

[4] Plaintiff does not respond to defendant's argument that familial status is not a protected classification under Title VII or CFEPA, and therefore I deem this claim to be abandoned. *See, e.g.*, *Nelson v. City of Stamford*, 2012 WL 233994, at *13 (D. Conn. 2012).

adverse employment action; and (4) that the circumstances of the adverse action give rise to an inference of discrimination. *See, e.g.*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). Second, if a plaintiff makes out this *prima facie* case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory basis for termination. *Ibid.* Lastly, if such a reason is advanced by a defendant, then the burden shifts back to the plaintiff to prove that the defendant's justification was in fact pretext for discrimination. *Ibid.* In showing pretext, a plaintiff must show not merely that the employer's proffered non-discriminatory reason is untrue or incomplete but also that discrimination was at least a substantial motivating factor for the employer's adverse action. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156-57 (2d Cir. 2010).

In light of this framework, I must first determine if plaintiff is a member of a protected class for purposes of the type of discrimination that she alleges. Title VII—as more recently amended by the Pregnancy Discrimination Act (PDA)—provides in relevant part that discrimination on the basis of sex includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical condition." 42 U.S.C. § 2000e(k). Although the Second Circuit has yet to address whether a plaintiff's nursing mother status is a "related medical condition" under Title VII and the PDA, the Fifth and Eleventh Circuits have sensibly concluded that lactation is a pregnancy-related medical condition that qualifies for protection from discrimination. *See Hicks v. City of Tuscaloosa, Alabama*, 870 F.3d 1253, 1258-60 (11th Cir. 2017); *E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013); *see also Mayer v. Prof'l Ambulance*, *LLC*, 211 F. Supp. 3d 408, 417 (D.R.I. 2016) (citing additional district court cases).

I have little doubt that the Connecticut Supreme Court would similarly hold that discrimination on the basis of a plaintiff's status as a nursing mother is likewise prohibited by CFEPA. Under CFEPA, the term "pregnancy" is defined to mean "pregnancy, childbirth or a related condition, including, but not limited to, lactation." Conn. Gen. Stat. § 46a-60(a)(1). Moreover, "discrimination on the basis of sex" is defined to include "discrimination related to pregnancy . . . or related medical conditions." Conn. Gen. Stat. § 46a-51(17). This language is similar to the language in Title VII, and under Connecticut law, it is well established that "Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws," with the Connecticut Supreme Court looking "to Title VII jurisprudence for guidance." *Comm'n of Human Rights and Opportunities v. Echo Hose Ambulance*, 322 Conn. 154, 160 (2016). Nothing in Connecticut law suggests that the Connecticut Supreme Court would construe CFEPA more narrowly on this issue than the federal courts to date have construed Title VII.

As to the second element of the *prima facie* case, there is little doubt that plaintiff was qualified for her position. Plaintiff received a number of positive performance reviews. *See, e.g.*, Doc. #22-6 at 25–50. Nor is there any doubt about the third element of the *prima facie* case: that plaintiff suffered an adverse employment action when her employment was terminated.

As to the final element of plaintiff's *prima facie* case, I conclude that a genuine fact issue exists as to whether the circumstances give rise to an inference of discrimination. Almost immediately after the change in the lactation policy in December 2014, tension between plaintiff and her supervisors arose. Brien and Ciotti entered plaintiff's office unannounced to try to catch plaintiff expressing milk. Doc. #17-2 at 17. Beley yelled at plaintiff for pumping in the restroom and became "hostile" after plaintiff filed her grievance. *Id.* at 23. Plaintiff continued to press the

11

lactation accommodation issue with Beley and suggested that she may become pregnant again in the future. Doc. #17-2 at 21. Beley was then involved in the decision to terminate plaintiff. Doc. #17-3 at 2. This proximity in time, coupled with the direct involvement of a supervisor both in the lactation-related confrontations and the decision to terminate plaintiff, is sufficient evidence to raise an inference of discrimination. *See, e.g.*, *Graciani v. Patients Medical, P.C.*, 2015 WL 5139199, at *10 (E.D.N.Y. 2015) (collecting cases).

Defendant nonsensically argues that "[p]laintiff has failed to adduce evidence showing that [it] treated her more harshly than 'similarly situated' employees who did not pump breast milk at work." Doc. #17-1 at 14. The whole premise of plaintiff's complaint is that she was burdened as a nursing mother in ways that non-nursing-mother employees were not.

That brings me to the second part of the *McDonnell-Douglas* test: whether defendant has advanced a legitimate, non-discriminatory reason for plaintiff's termination. Here the defendant asserts that plaintiff was terminated for violating HIPAA and hospital policy by improperly accessing a patient chart without a business reason for doing so. Doc. #17-3 at 1-2. Defendant has easily met its obligation to identify a non-discriminatory reason for terminating plaintiff's employment.

And so the only question remaining is whether there is a genuine fact issue that defendant's stated reason for discharging plaintiff was a pretext for discrimination against plaintiff because of her sex. On the one hand, defendant contends that "[a]n employer's good-faith belief that an employee has committed misconduct provides the employer with a nondiscriminatory reason for termination, whether or not the misconduct occurred." *Nicolock Paving Stones of New England, LLC*, 2006 WL 2474950, at *7 (D. Conn. 2006); *see also Peterson v. Connecticut Light & Power Co.*, 2014 WL 7156648, at *6 (D. Conn. 2014).

Defendant points to the fact that supervisors investigated plaintiff for accessing the patient's chart before and after plaintiff was terminated and concluded that "there was no policy or practice that necessitated [plaintiff's] access given the specific circumstances involved." Doc. #17-1 at 19. Indeed, a male paramedic was also terminated for accessing the same patient's chart. Doc. #17-3 at 2. Moreover, according to defendant, it acted in good faith, because it engaged in pre- and post-termination investigation of plaintiff's grievance. *See* Doc. #22-7 at 41-48; Doc. #17-2 at 40.

Still, plaintiff contends that a reasonable jury could conclude that her act of viewing the patient's chart for less than 20 seconds was within the scope of her duties and that sex-based discrimination was at least a substantial motivating factor for her discharge. Plaintiff testified that, in her role as Clinical Bed Manager, she screened for what a patient's needs were, including patients who were in the emergency department. While the patient in question was going to be transferred to a department with its own bed managers, plaintiff and her colleagues routinely accessed such patients' records to assess whether the patient had any medical needs. Doc. #17-2 at 25.

Plaintiff's description of the scope of her duties is supported by the testimony of her colleague Konet. In her affidavit, Konet explains, "The access to that patient's file in this case was completely normal and necessary for [plaintiff] to perform her job. She was engaged in the usual triaging . . . ." Doc. #22-4 at 6.

Plaintiff also points to copies of her job description in support of her claim that her action was within the scope of her duties. Two job descriptions—dated November 2010 and September 2014—state that a "Clinical Bed Manager is responsible for oversight of *all* patient admissions, discharges and transfer activity while monitoring capacity both currently and prospectively" and

"is the liaison between *all* points of entry, [various staff], and inpatient bed resources *throughout the institution*." Doc. #22-7 at 7, 12 (emphasis added). A little over three months after plaintiff was terminated, her job description was amended to exclude the department to which the patient in question was set to be transferred. *Id.* at 18.

On balance, I conclude that a reasonable jury could conclude that defendant's decision to terminate plaintiff's employment was substantially motivated by her nursing-related activity and that its proffered reason for terminating her employment was at best incomplete. Plaintiff has substantial arguments that what she did was within the scope of her job responsibilities and that the investigation of her access to the patient's chart arose in circumstances of discriminatory hostility against her. Indeed it was Beley, who had been at the center of the conflict over plaintiff's lactation, who requested the audit of the patient's chart that in turn led to the investigation that she spearheaded. Doc. #22-7 at 41-46. Beley was also, at least in part, responsible for the termination decision. Doc. #17-3 at 2.

Viewing the evidence in the light most favorable to plaintiff, I conclude a reasonable jury could find that plaintiff was discriminated against on the basis of her sex and pregnancy. Accordingly, I will deny defendant's motion for summary judgment with respect to plaintiff's sex and pregnancy discrimination claims under Title VII and CFEPA (Counts Two and Three).

### *Counts Two and Three – Retaliation*

Although none of the charged counts in the complaint expressly allege a claim for retaliation, I will consider this claim insofar as several of the factual allegations within the body of the complaint refer to retaliation and the allegations of discrimination are intertwined with plaintiff's protests to superiors about the restrictions placed on her. Just as for a claim of discrimination, a claim of retaliation—whether stated under Title VII or CFEPA—is subject to a

similar *McDonnell-Douglas* burden-shifting test. First, a plaintiff must make a *prima facie* showing that she participated in a protected activity of complaining about discrimination and that she was subject to an adverse employment action because of her protected activity of complaining about discrimination. Next the employer must advance a legitimate, non-retaliatory reason for the adverse action, and then the plaintiff must come forward with enough evidence of pretext and to show that the adverse action would not have occurred but for the plaintiff's engagement in protected complaint activity. *See, e.g., Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 843-46 (2d Cir. 2013); *Kaytor*, 609 F.3d at 552-53, 556.

So long as a plaintiff has a good faith, reasonable basis for complaint, she may not be subject to retaliation for complaining about discrimination even if her claim for discrimination does not prove to be true. *See, e.g., Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (*per curiam*). In view that a genuine fact issue remains to sustain plaintiff's claim of discrimination, a genuine fact issue correlatively remains as to whether plaintiff had a good faith and reasonable basis to believe that she was subject to discrimination.

A plaintiff of course must also make clear in her complaint to the employer that she objected to conduct that she believed was discrimination of the kind that is prohibited under Title VII. *Id.* at 15. Although plaintiff here did not cite Title VII or CFEPA to her supervisors or explicitly frame her internal complaint as one of "discrimination," at least a genuine fact issue remains to suggest that defendant would have understood her to be protesting conduct involving sex/pregnancy-related restrictions that amounted to a violation of law. *See id.* at 17 (complaint sufficient if it would have allowed the employer to reasonably have understood that her opposition was directed at conduct that is prohibited under Title VII). Plaintiff, for example,

15

made very clear her objection to enforcement of the lactation room policy against her, and she complained to Wurcel that the head of Human Resources was "biased" when telling plaintiff that she had been "'accommodated with breast feeding long enough and it's time to return to business as usual.'" Doc. #17-2 at 31.

Accordingly, I conclude that there is a genuine fact issue as to whether plaintiff engaged in protected complaint activity. And I likewise conclude for substantially the same reasons discussed above (and even accounting for the slightly higher causal standard that accompanies a claim for retaliation versus discrimination) that a genuine fact issue remains whether plaintiff was discharged because of her complaints about conduct that she could reasonably have believed to be true and that defendant in turn could have understood to be a violation of the anti-discrimination protections of Title VII and CFEPA.

## CONCLUSION

Defendant's motion for summary judgment (Doc. #17) is GRANTED in part and DENIED in part. The motion is GRANTED as to Count One (violation of Conn. Gen. Stat. § 46a–58) and GRANTED as to Counts Two and Three insofar as these counts may be based on a claim of discrimination on the basis of familial relation. The motion is otherwise DENIED as to Counts Two and Three insofar as these counts are based on claims of discrimination and retaliation based on sex, gender, and pregnancy.

It is so ordered.

Dated at New Haven, Connecticut, this 12th day of December 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge